# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2978

_____

Terrick Terrell Nooner,

                   Appellant,

Don William Davis;
Jack Harold Jones, Jr.,

               Intervenor Plaintiffs-Appellants,

             v.

Larry Norris, in his official capacity
as Director, Arkansas Department of
Correction; Gaylon Lay, in his official
capacity as Warden, Arkansas
Department of Correction, Cummins
Unit; Wendy Kelly, in her official
capacity as Deputy Director for Health
and Correctional Programs, Arkansas
Department of Correction; John Byus,
in his official capacity as Administrator,
Correctional Medical Services,
Arkansas Department of Correction;
Does, 1-50, unknown executioners,
in their official capacities as employees
and/or agents of the Arkansas
Department of Correction,

             Appellees,

Appeal from the United States
District Court for the
Eastern District of Arkansas.

------------------------------

Frank Williams, Jr.,                      *
                                          *
          Appellant,                      *
                                          *
     v.                                   *
                                          *
Larry Norris, in his official capacity    *
as Director, Arkansas Department of       *
Correction; Gaylon Lay, in his official   *
capacity as Warden, Arkansas              *
Department of Correction, Cummins         *
Unit; Wendy Kelly, in her official        *
capacity as Deputy Director for Health    *
and Correctional Programs, Arkansas       *
Department of Correction; John Byus,      *
in his official capacity as Administrator, *
Correctional Medical Services,            *
Arkansas Department of Correction;        *
Does, 1-50, unknown executioners,         *
in their official capacities as employees  *
and/or agents of the Arkansas             *
Department of Correction,                 *
                                          *
          Appellees.                      *

                         _____

               Submitted: September 24, 2009
                  Filed:  February 8, 2010
                         _____

Before MELLOY, GRUENDER and BENTON, Circuit Judges.
                         _____

GRUENDER, Circuit Judge.

     Terrick Terrell Nooner, Don William Davis, Jack Harold Jones and Frank
Williams, Jr. (collectively, "the Inmates") were each convicted of capital murder in

Arkansas.  Their convictions have been affirmed, their petitions for post-conviction relief have been denied, and they await execution by the State of Arkansas.  In this 42 U.S.C. § 1983 lawsuit against Larry Norris, Director of the Arkansas Department of Correction, and other corrections employees (collectively, "the ADC"), the Inmates challenge the constitutionality of Arkansas's protocol for execution by lethal injection. The district court[1] granted the ADC's motion for summary judgment, and the Inmates now appeal.  For the following reasons, we affirm.

## I.    BACKGROUND

Nooner filed his lawsuit on May 1, 2006.  Davis and Jones filed motions to intervene as party plaintiffs, which the district court granted on May 26, 2006, and December 1, 2006, respectively.  On August 9, 2007, the district court ordered the case consolidated with a similar lawsuit filed by Williams on July 11, 2007.

On June 26, 2006, the district court granted Davis a preliminary injunction, staying his execution.  The ADC appealed, and on July 9, 2007, we vacated the preliminary injunction and stay of execution.  *Nooner v. Norris*, 491 F.3d 804, 806 (8th Cir. 2007).  The next day, the Inmates sought discovery for the first time by filing a motion for expedited discovery.  The district court denied the Inmates' motion for expedited discovery on August 9, 2007, but the ADC nevertheless produced more than 300 pages of documents in response.  The ADC moved for summary judgment, arguing that the Inmates had failed to establish a genuine issue of material fact about the constitutionality of Arkansas's lethal injection protocol.  The Inmates sought shelter under Federal Rule of Civil Procedure 56(f), claiming that they lacked access to the facts necessary to oppose the ADC's motion for summary judgment and that they needed further discovery.

---

[1]The Honorable Susan Webber Wright, United States District Judge for the Eastern District of Arkansas.

Before the district court ruled on the ADC's motion for summary judgment, the Supreme Court granted certiorari in *Baze v. Rees*, 552 U.S. 945 (2007), a case challenging the constitutionality of Kentucky's lethal injection protocol. Accordingly, the district court denied the ADC's motion for summary judgment without prejudice and stayed and administratively terminated the Inmates' lawsuit pending the outcome in *Baze*.

The Supreme Court issued its decision in *Baze* on April 16, 2008, upholding Kentucky's lethal injection protocol. 553 U.S. 35, 128 S. Ct. 1520 (2008). The Inmates successfully moved to reopen their case on May 15, 2008. The ADC amended its lethal injection protocol on May 22, 2008, and moved for summary judgment on June 4, 2008. The Inmates opposed this motion but did not renew their request for a continuance to obtain further discovery under Rule 56(f). On August 5, 2008, the district court granted the ADC's motion for summary judgment.

Under Arkansas law, the Director of the ADC is responsible for determining the policies and procedures followed by the ADC to execute prisoners by lethal injection. Ark. Code Ann. § 5-4-617(a)(4). The parties refer to the set of execution instructions he has developed—and revised—as the Arkansas lethal injection protocol.

Ray Hobbs, Chief Deputy Director of the ADC, submitted an affidavit ("the Hobbs affidavit") dated July 28, 2008, stating that he was authorized to make statements about the protocol on behalf of the ADC. The Inmates have not argued that Hobbs acted ultra vires in submitting this affidavit, and the ADC specifically stated at oral argument that it considers the statements in the Hobbs affidavit to be binding on the ADC. Because the ADC may amend the protocol at the Director's discretion, *see* Ark. Code Ann. § 5-4-617, we accept the Hobbs affidavit as a written addendum to the May 22, 2008 protocol.

Under the protocol, the ADC's Deputy Director for Health and Correctional Programs is primarily responsible for supervising executions. The Deputy Director must be "healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of lethal chemicals, and assessing the presence or absence of consciousness." The protocol allows a designee to perform the functions of the Deputy Director, but the designee must meet the same qualifications. If needed, the Deputy Director provides an orientation for the executioners before each execution. She also selects the IV team, which is responsible for establishing intravenous infusion sites in condemned prisoners. Each member of the IV team must have at least two years of professional experience as an emergency medical technician, nurse, physician assistant or physician.

Arkansas administers the same combination of lethal chemicals to execute prisoners that at least thirty other states use: sodium pentothal, pancuronium bromide and potassium chloride. *See Baze*, 128 S. Ct. at 1527 (plurality opinion).[2] Before each execution, the Deputy Director is responsible for ensuring that the lethal chemicals are mixed properly and transferred to conspicuously numbered syringes that are secured in a carrying case.[3]

_____

[2]All references to *Baze*, unless otherwise indicated, are to the plurality opinion written by Chief Justice Roberts.

[3]The protocol identifies the label and contents of each syringe as follows:

SYRINGE
LABELED/
MARKED    CONTENTS
   #1/#2    Sodium  Pentothal, 3.0 grams (two (2) syringes
          of 1.5 grams in 60 cc)
   #3/#6    Normal Saline, 50 cc each
   #4/#5    Pancuronium Bromide, 100 mg (two (2)
          syringes of 50 mg in 50 cc)

Arkansas executes condemned prisoners in an execution chamber that is adjoined by a witness room and a control room. There is a large window between the execution chamber and the witness room that can be covered by a curtain. From the control room, the executioners can see into the execution chamber through a one-way mirror. The protocol directs the Deputy Director to bring the condemned prisoner into the execution chamber strapped to a gurney, which is positioned directly in front of the one-way mirror so that the Deputy Director and the executioners can observe the IV infusion sites and the prisoner's face throughout the execution. The Deputy Director affixes cardiac monitor leads to the prisoner and then summons the IV team.

The IV team establishes two independent IV infusion sites, preferably one in each of the prisoner's arms. If two sites cannot be established, the protocol directs the Deputy Director to dismiss the IV team and "summon trained, educated, and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line." After the infusion sites are established, the IV team connects the IV lines to the control room with extension tubing, allowing the executioners to administer the lethal chemicals from the control room. When the warden authorizes the executioners to begin injecting the lethal chemicals, the curtain between the execution chamber and the witness room is opened.

The executioners first inject two syringes containing three grams of sodium pentothal, a barbiturate, into the primary IV line. The protocol requires the Deputy Director to wait at least three minutes after the executioners begin the injection of sodium pentothal before directing the executioners to administer the contents of the

---

    #7/#8    Potassium Chloride, 240 mEq (two (2) syringes of 120 mEq in 60 cc)

Backup Syringes

    #B1/B2    Sodium Pentothal, 3.0 grams (two (2) syringes of 1.5 grams in 60 cc)

    #B3    Normal Saline, 50 cc

remaining syringes. During this time, the protocol instructs the Deputy Director to use standard medical techniques, "such as checking for movement, opened eyes, eyelash reflex, and response to verbal commands and physical stimuli," to verify that the prisoner has been rendered completely unconscious. After three minutes have elapsed and the Deputy Director verifies that the prisoner is completely unconscious, the protocol instructs the executioners to inject a syringe of normal saline to flush the IV line, followed by two syringes containing 100 mg of pancuronium bromide, which paralyzes the prisoner's muscles and stops respiration. After injecting another syringe of saline, the executioners administer two syringes containing 240 mEq of potassium chloride, which induces cardiac arrest.

The protocol requires the Deputy Director to monitor the primary IV infusion site continuously and to reduce the flow of lethal chemicals or redirect them to the alternate infusion site if she suspects a problem. The curtain between the witness room and the execution chamber is closed if an infusion problem develops but otherwise remains open during the administration of lethal chemicals. After the cardiac monitors display a flat-line, a coroner is summoned to pronounce death. Prison officials then close the curtain to the witness room and escort the witnesses from the building.

The Inmates argue that the district court abused its discretion in finding that the case is ripe for summary judgment. They also argue that the district court erred in granting summary judgment to the ADC because the record establishes genuine issues of material fact about whether Arkansas's lethal injection protocol is unconstitutional.

## II.    DISCUSSION

The Eighth Amendment, applicable to the states through the Fourteenth Amendment, prohibits cruel and unusual execution procedures. *See Baze*, 128 S. Ct. at 1530. Challenges to the constitutionality of a state's lethal injection procedures are cognizable under 42 U.S.C. § 1983. *Hill v. McDonough*, 547 U.S. 573, 576 (2006).

"We begin with the principle . . . that capital punishment is constitutional." *Baze*, 128 S. Ct. at 1529 (citing *Gregg v. Georgia*, 428 U.S. 153, 177 (1976) (plurality opinion)). "It necessarily follows that there must be a means of carrying it out." *Id.* "[T]he Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Id.* To establish a violation of the Eighth Amendment, an execution procedure must be "'sure or very likely to cause . . . needless suffering,' and give rise to 'sufficiently imminent dangers.'" *Id.* at 1531 (quoting *Helling v. McKinney*, 509 U.S. 25, 33-34 (1993)). "[T]o prevail on such a claim there must be a 'substantial risk of serious harm,' . . . that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842, 846 and n.9 (1994)). "The mere fact 'an execution method may result in pain, either by accident or as an inescapable consequence of death,' does not amount to an Eighth Amendment violation." *Clemons v. Crawford*, 585 F.3d 1119, 1125 (8th Cir. 2009) (quoting *Baze*, 128 S. Ct. at 1531). The Supreme Court "has never invalidated a State's chosen procedure for carrying out a sentence of death as the infliction of cruel and unusual punishment." *Baze*, 128 S. Ct. at 1530.

In *Taylor v. Crawford*, we reviewed a facial challenge to the constitutionality of Missouri's lethal injection protocol. 487 F.3d 1072, 1085 (8th Cir. 2007), *cert. denied*, 553 U.S. ---, 128 S. Ct. 2047 (2008). We determined that the constitutionality of Missouri's protocol "depends upon whether the protocol as written would inflict unnecessary pain, aside from any consideration of specific intent on the part of a

particular state official." *Id.* at 1081. Accordingly, we focused on the written protocol to determine whether it "presents a substantial risk of inflicting unnecessary pain," *id.* at 1080, and we held that Missouri's protocol did not violate the Eighth Amendment, *id.* at 1085.

After our decision in *Taylor*, the Supreme Court upheld Kentucky's lethal injection protocol in *Baze*. 128 S. Ct. at 1526. The Court's opinion was fractured, and no opinion commanded a majority of the Justices. However, a three-Justice plurality concluded, in an opinion written by Chief Justice Roberts, that a lethal injection protocol must create a "substantial risk of serious harm" to be unconstitutional. *Id.* at 1531 (quoting *Farmer*, 511 U.S. at 842). Following *Baze*, no federal appellate court has invalidated a lethal injection protocol under the Eighth Amendment. *Cooey v. Strickland*, 589 F.3d 210, 221 (6th Cir. 2009) (collecting cases).

In *Clemons v. Crawford*, we relied on *Baze* to hold that eight condemned prisoners in Missouri could not "support an Eighth Amendment claim" because they had not "alleged a sufficiently substantial risk of serious harm" in challenging Missouri's implementation of its protocol. 585 F.3d at 1127-28; *see also Harbison v. Little*, 571 F.3d 531, 535 (6th Cir. 2009) ("Chief Justice Roberts's plurality opinion [in *Baze*] is controlling."), *petition for cert. filed*, --- U.S.L.W. --- (U.S. Nov. 23, 2009) (No. 09-7777); *Emmett v. Johnson*, 532 F.3d 291, 298 n.4 (4th Cir. 2008) (concluding that the plurality opinion "represents the controlling opinion of the Court"). In this case, we are called on to decide whether the Arkansas lethal injection protocol violates the Eighth Amendment's prohibition against cruel and unusual punishment by subjecting the Inmates to a substantial risk of serious harm.

## A. Ripeness of Summary Judgment Motion

As a preliminary matter, however, the Inmates argue that their case is not ripe for summary judgment. We review the district court's determination that a case is ripe for summary judgment for abuse of discretion. *Nolan v. Thompson*, 521 F.3d 983, 986 (8th Cir. 2008).

"Discovery does not have to be completed before a court can grant summary judgment, but summary judgment is proper only after the nonmovant has had adequate time for discovery." *In re TMJ Implant Prods. Liab. Litig.*, 113 F.3d 1484, 1489-90 (8th Cir. 1997) (internal citations omitted). The record shows that the Inmates had adequate time to conduct discovery. This lawsuit was initially filed on May 1, 2006, but the Inmates did not request discovery for more than fourteen months, when they sought expedited discovery. The Inmates attribute this fourteen-month delay to the district court's failure to enter a scheduling order, which they assert is normally the starting point for discovery in Arkansas. As the district court correctly noted, however, the "lack of a scheduling order did not prevent counsel from conferring and developing a discovery plan as required under Federal Rule of Civil Procedure 26(f); nor did it prevent Nooner from requesting that the Court enter a scheduling order." *Nooner v. Norris*, No. 5:06-cv-001100, 2007 WL 2301221, at *3 (E.D. Ark. Aug. 9, 2007) (unpublished) (footnote omitted) (citing *Nickens v. White*, 622 F.2d 967, 971 (8th Cir. 1980)).

In any event, the Inmates sought shelter under Federal Rule of Civil Procedure 56(f) on July 30, 2007, claiming that without discovery they lacked the facts necessary to oppose the ADC's initial motion for summary judgment. Subsequently, the ADC voluntarily produced more than 300 pages of documents to the Inmates. On November 9, 2007, the district court stayed and administratively terminated the lawsuit pending the Supreme Court's decision in *Baze*. After the district court reopened this case on May 21, 2008, the ADC filed a second motion for summary

judgment. In opposing the ADC's motion, the Inmates did not renew their request for a continuance to obtain further discovery under Rule 56(f).[4]   Under these circumstances, the district court did not abuse its discretion in finding that the case is ripe for summary judgment.  *See In re TMJ Implant Prods. Liab. Litig.*, 113 F.3d at 1490 ("If a party opposing a summary judgment motion does not seek shelter under Rule 56(f) or otherwise ask for a continuance, a court generally does not abuse its discretion in granting summary judgment based on the record before it." (citing *Wallace v. Dorsey Trailers Se., Inc.*, 849 F.2d 341, 344 (8th Cir. 1988))); *Ballard v. Heineman*, 548 F.3d 1132, 1136 (8th Cir. 2008) ("The district court does not abuse its discretion by denying further discovery 'where the nonmoving party is not deprived of a fair chance to respond to the summary judgment motion.'" (quoting *Nord v. Kelly*, 520 F.3d 848, 852 (8th Cir. 2008))).

## B.   Summary Judgment

Turning to the merits, "[w]e review a district court's grant of summary judgment de novo, using the same standards applied by the district court." *Schoolhouse, Inc. v. Anderson*, 275 F.3d 726, 728 (8th Cir. 2002) (citing *Iowa Coal Mining Co. v. Monroe County*, 257 F.3d 846, 852 (8th Cir. 2001)).  "Summary judgment is proper where the evidence, when viewed in the light most favorable to the nonmoving party, indicates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law." *Davison v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007) (quoting *Hughes v. Stottlemyre*, 454 F.3d 791, 796 (8th Cir. 2006)).  We must affirm the district court's grant of summary judgment unless a reasonable fact finder, viewing the evidence in the light most favorable to the Inmates, could return a verdict in their favor.  *See Prosser v. Ross*, 70

---

[4]The district court granted the Inmates a thirty-day extension to file their response in opposition to the ADC's motion for summary judgment, but they did not argue that they needed the time to conduct discovery or that they lacked access to the facts needed to oppose the ADC's motion.

F.3d 1005, 1009 (8th Cir. 1995). The Inmates contend that summary judgment was improper with respect to eight issues. We examine each in turn.

### 1.    The Risk of Remaining Conscious

The combination of lethal chemicals that Arkansas and at least thirty other states use to execute prisoners has been designed to cause as little pain as possible. *See Baze*, 128 S. Ct. at 1527 n.1 (noting that "in moving to lethal injection, the States were motivated by a desire to find a more humane alternative to then-existing methods"). "The proper administration of [sodium pentothal] ensures that the prisoner does not experience any pain associated with the paralysis and cardiac arrest caused by the [pancuronium bromide] and [potassium chloride]." *Id.* at 1527. In this case, the Inmates have not challenged the opinion of the ADC's expert witness, Dr. Mark Dershwitz, that within sixty seconds of the injection of all three grams of sodium pentothal "more than 99.9999999% of the population would be unconscious." However, it is also undisputed that if the other chemicals were administered to a prisoner while still conscious, he would feel "an excruciating burning sensation as [the potassium chloride] travels through his veins to induce a heart attack, and yet he would be unable to indicate that he is experiencing pain due to the paralyzing effects of the second chemical, pancuronium bromide." *See Taylor,* 487 F.3d at 1074.

The Arkansas protocol contains several safeguards to ensure that the sodium pentothal is administered properly and that the prisoner has been rendered fully unconscious before the pancuronium bromide and potassium chloride are injected. The protocol requires the Deputy Director to wait three minutes after the injection of sodium pentothal before directing the executioners to administer the remaining chemicals. During this time, the Deputy Director must verify that the prisoner is unconscious by using "standard procedures for assessing consciousness as required by medical paraprofessionals, such as checking for movement, opened eyes, eyelash reflex, and response to verbal commands and physical stimuli." If the prisoner

remains conscious after the injection of the sodium pentothal, the protocol requires the Deputy Director to direct the executioners to inject the back-up doses of sodium pentothal into the secondary IV line. Finally, the protocol requires the Deputy Director to continuously monitor the IV infusion sites throughout the execution and to suspend the flow of lethal chemicals if she suspects a problem.

The Inmates argue that evidence about four previous executions in Arkansas establishes a genuine issue of material fact regarding whether the protocol creates a substantial risk of serious harm. In particular, they assert that the ADC "botched" the executions of Ronald Gene Simmons on June 25, 1990; of Rickey Ray Rector on January 24, 1992; of Steven Douglas Hill on May 7, 1992; and of Christina Riggs on May 2, 2000. In the light most favorable to the Inmates, the record shows that each of these condemned prisoners exhibited signs of consciousness within three minutes of the injection of sodium pentothal. Thus, according to the Inmates, these executions create a genuine issue of material fact about whether the current protocol sufficiently ensures that they will be fully unconscious before the pancuronium bromide and potassium chloride are administered.

We emphasized in *Taylor* that when reviewing the constitutionality of a state's lethal injection protocol we review the current protocol as written. *See* 487 F.3d at 1080 ("The focus of our inquiry is whether the written protocol inherently imposes a constitutionally significant risk of pain."). Moreover, we held that if the written protocol is not unconstitutional on its face, "any risk that the [lethal injection] procedure will not work as designated in the protocol is merely a risk of accident, which is insignificant in our constitutional analysis." *Id.* The plurality in *Baze* similarly stated that "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such an event, while regrettable, does not suggest cruelty.'" 128 S. Ct. at 1531 (citing *Farmer*, 511 U.S. at 842).

The Inmates point to the plurality's suggestion in *Baze* that a "series of abortive" execution attempts "would present a different case," *id.*, to claim that their evidence of problems during previous executions creates a genuine issue of material fact about the constitutionality of the Arkansas protocol. These four executions were not carried out under the current protocol, however. As discussed above, the current protocol contains numerous safeguards designed to prevent the ADC from administering pancuronium bromide and potassium chloride to a prisoner who is not fully unconscious. Thus, even if the ADC engaged in a "series of abortive" execution attempts under previous protocols, the record does not establish a genuine issue of material fact about whether the Inmates will remain conscious during the injection of the pancuronium bromide and potassium chloride under the current protocol.

The Inmates correctly point out that the record does not contain the lethal injection protocols in place at the time Simmons, Rector, Hill and Riggs were executed. According to the Inmates, this creates a genuine issue of material fact about whether the ADC has engaged in a "series of abortive" execution attempts despite the safeguards required by the current protocol because it is possible the previous protocols contained the same safeguards. Although the record does not identify or describe the protocols in place at the time of the four previous executions, it does contain lethal injection protocols dated May 23, 1996, and November 23, 2005. These protocols lacked many of the safeguards required by the current protocol. For instance, the 1996 protocol did not require ADC officials to monitor the IV infusion sites, and it did not contain a contingency plan for addressing infusion problems. Neither the 1996 nor the 2005 protocol required ADC officials to pause between the administration of sodium pentothal and pancuronium bromide to determine whether the prisoner is unconscious, nor did they require the preparation or administration of back-up syringes of sodium pentothal. The current protocol is much more thorough than these earlier protocols and, as discussed above, contains procedures that sufficiently protect prisoners from remaining conscious during the injection of the pancuronium bromide and potassium chloride. *Cf. Harbison*, 571 F.3d at 536-37

(upholding the Tennessee lethal injection protocol despite the state's decision to reject a review committee's recommendation to adopt procedures for assessing consciousness after the administration of sodium pentothal).

The Inmates urge us to ignore the safeguards in the current protocol and find that there is a genuine issue of material fact about whether the protocols that governed the executions carried out in 1990, 1992 and 2000 contained safeguards that were not part of the 1996 and 2005 protocols. We reject this argument. The possibility that the ADC removed significant safeguards in 1996 and 2005, only to reinstate them in the May 22, 2008 protocol, is so unlikely that it amounts to little more than pure speculation. *See Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) ("[S]ummary judgment will not be reversed on the basis of speculation, conjecture, or fantasy." (citing *Potman v. Unity Health Sys., Inc.*, 348 F.3d 732, 733-34 (8th Cir. 2003))). Under the current protocol, "any risk that [Arkansas's lethal injection] procedure will not work as designated . . . is merely a risk of accident, which is insignificant in our constitutional analysis." *Taylor*, 487 F.3d at 1080.

We hold that the Inmates' evidence of previous executions does not establish that the Arkansas protocol creates a substantial risk of serious harm that the Inmates will remain conscious after the administration of the sodium pentothal.

### 2. Intracardiac Infusion

The Inmates argue that the record establishes a genuine issue of material fact about whether the ADC plans to use "intracardiac infusion" in future executions. In this context, intracardiac infusion refers to a potentially painful procedure whereby lethal chemicals are injected directly into a chamber of the heart with a large needle. The November 23, 2005 version of the protocol authorized this procedure as a last resort, but the May 22, 2008 version does not mention it. Nevertheless, the Inmates claim that the ADC plans to use this procedure under the current protocol based on a

-15-

July 18, 2008 newspaper article in which ADC spokeswoman Dina Tyler is reported to have said that the ADC could start a line directly to a condemned prisoner's heart if necessary. The ADC argues that this article is hearsay and cannot be relied on to oppose summary judgment.

We have held that "only evidence that would be admissible at trial may be relied upon to counter a motion for summary judgment." *Sokol & Assocs., Inc. v. Techsonic Indus., Inc.*, 495 F.3d 605, 611 n.4 (8th Cir. 2007) (citing *Shaver v. Indep. Stave Co.*, 350 F.3d 716, 723 (8th Cir. 2003)). The Inmates argue that Tyler's statement is admissible under Federal Rule of Evidence 801(d)(2) as a non-hearsay admission of a party opponent. This argument fails to distinguish Tyler's statement from the newspaper article containing the statement. Newspaper articles are "rank hearsay." *See Miller v. Tony & Susan Alamo Found.*, 924 F.2d 143, 147 (8th Cir. 1991). Even if Tyler's statement is viewed as a non-hearsay admission of a party opponent, the newspaper article reporting the statement is offered to prove the truth of the matter asserted and is not covered by any hearsay exception. Therefore, the article's description of Tyler's statement about intracardiac infusion "cannot be admitted for its truth." *See United States v. Santisteban*, 501 F.3d 873, 878-79 (8th Cir. 2007).

Even assuming the newspaper article is admissible evidence, the Inmates would still fail to establish a genuine issue of material fact about whether the ADC plans to use intracardiac infusion in future executions. The Hobbs affidavit flatly states that "intracardiac infusion will not be performed during any future lethal-injection execution carried out by the ADC." The affidavit is dated July 28, 2008, ten days after the newspaper account of Tyler's statement. Because we treat the Hobbs affidavit as a binding written addendum to the protocol, we conclude that it supersedes Tyler's statement.

-16-

### 3. Central line placement

If the IV team cannot establish IV access through traditional methods, the protocol authorizes the Deputy Director to summon "trained, educated, and experienced person(s)" to establish a central venous line by inserting a catheter in the femoral, jugular or subclavian vein. The Inmates argue that this "vague, standardless provision . . . places no meaningful restrictions whatsoever upon who may perform this dangerous procedure" and that the protocol therefore authorizes unqualified personnel to establish such lines. We reject the Inmates' argument. "[I]t is imperative for the State to employ personnel who are properly trained to competently carry out each medical step of the [lethal injection] procedure." *Clemons*, 585 F.3d at 1128 (quoting *Taylor*, 487 F.3d at 1084). The protocol's requirements satisfy this standard. Moreover, the Hobbs affidavit clarifies that any attempt to place a central venous line will be performed by "a licensed physician who is credentialed to establish" such lines.[5] The Inmates have not established a genuine issue of material fact about whether they face a substantial risk of serious harm from the placement of central venous lines by unqualified ADC personnel.

### 4. Cut-down procedure

The Inmates argue that the protocol authorizes ADC personnel to use a "cut-down" procedure if they are unable to obtain intravenous access by other methods. They define a cut-down as "an incision into the prisoner's flesh deep enough to expose the vein for direct insertion of the needle and catheter." The Inmates characterize the procedure as "brutal, agonizing" and "barbaric." They point to the 1992 execution of Rickey Ray Rector as evidence that future prisoners will be "subject to the procedure that led to [his] torturous death." In that instance, ADC

---

[5]We need not consider whether a central venous line may constitutionally be established by someone other than a licensed physician.

personnel were unable to establish infusion sites through traditional methods and eventually made a two-inch incision in Rector's arm. Rector reportedly groaned periodically during the ADC's attempts to establish intravenous access. The Inmates argue that this evidence suggests that they face a substantial risk of serious harm from a cut-down procedure.

Although the current protocol does not expressly authorize a cut-down procedure, the ADC acknowledges that it might be necessary to make incisions on some prisoners to establish IV access. However, the Hobbs affidavit clarifies that any such incision would be made by a licensed physician who is properly qualified to carry out the procedure. Moreover, the protocol states that all attempts to obtain IV access must avoid unnecessary pain by using local anesthetic as necessary.[6] The Inmates have not argued, nor does the record establish, that an incision made under these conditions rises to the level of serious harm. Accordingly, we conclude that the Inmates have failed to establish a genuine issue of material fact about whether they face a substantial risk of serious harm from a cut-down procedure. *Cf. Cooey*, 589 F.3d at 228 (noting that the Sixth Circuit upheld Tennessee's lethal injection protocol even though it expressly authorizes a physician to use a cut-down procedure to gain IV access as a contingency plan).

---

[6]The protocol provides:

> EVERY EFFORT WILL BE EXTENDED TO THE CONDEMNED INMATE TO ENSURE THAT NO UNNECESSARY PAIN OR SUFFERING IS INFLICTED BY THE IV PROCEDURE. STANDARD PRACTICE OF USING A LOCAL ANESTHETIC WILL BE ACCOMMODATED AS NECESSARY.

### 5.    IV Team Qualifications

The Inmates argue that the ADC does not require its IV team members to have qualifications and experience comparable to those required by the Kentucky protocol upheld in *Baze*.  The *Baze* plurality stated that Kentucky has instituted "important safeguards" to ensure that the lethal chemicals used in its executions are properly administered.  128 S. Ct. at 1533.  Specifically, Kentucky's protocol requires each member of its IV team to have at least one year of professional experience as a phlebotomist, emergency medical technician, paramedic, certified medical assistant or military corpsman. *Id.*  The plurality noted that the current members of Kentucky's IV team insert IV catheters on a daily basis and that the Kentucky protocol requires the IV team to engage in at least ten practice sessions each year.  *Id.* at 1533-34.  But the plurality made clear that the "most significant" of Kentucky's safeguards was the requirement that each member of the IV team have at least one year of professional experience.  *Id.* at 1533.[7]

The Arkansas protocol goes even further than the Kentucky protocol by requiring IV team members to have at least two years of professional experience as

---

[7]The Inmates assert that the *Baze* plurality found that the daily experience of the IV team members was equally significant.  This argument mischaracterizes *Baze*.  The opinion states:

> Kentucky has put in place several important safeguards to ensure that an adequate dose of sodium thiopental is delivered to the condemned prisoner.  *The most significant of these* is the written protocol's requirement that members of the IV team must have at least one year of professional experience as a certified medical assistant, phlebotomist, EMT, paramedic, or military corpsmen.

*Baze*, 128 S. Ct. at 1533 (emphasis added).

an emergency medical technician, nurse, physician assistant or physician. The record does not show how often the current members of the IV team establish IV lines, but the two-year professional experience requirement ensures that IV team members are qualified and competent to insert IV catheters. Moreover, the Inmates are wrong to suggest that "no training of the IV Team members whatsoever is conducted" in Arkansas. The protocol does not include a specific schedule for practice execution sessions, but that does not mean such practice sessions do not take place. Indeed, the protocol outlines a procedure for conducting practice execution sessions and requires the IV team to "initiate intravenous infusion devices" during each practice session. We conclude that the required qualifications for IV team members in Arkansas under the current protocol are substantially similar to the requirements of the Kentucky protocol upheld in *Baze*. *See* 128 S. Ct. at 1537 (observing that a state "with a lethal injection protocol substantially similar to" Kentucky's protocol would be constitutional).

The Inmates also argue that the Deputy Director is not qualified to supervise the IV team. They argue that the protocol's requirement that the Deputy Director be "healthcare trained, educated, and/or experienced" is vague. This argument ignores other relevant language in the same sentence, which in full states that the Deputy Director must be "healthcare trained, educated, and/or experienced *in matters related to the establishment and monitoring of IVs*." (Emphasis added.) The Inmates also argue that the Deputy Director must hold the same "credentials, qualifications and competencies" as the members of the IV team. We reject this argument. The Deputy Director supervises the IV team and monitors the infusion sites, but she does not personally establish any of the IV lines and is not a member of the IV team. The qualifications required by the protocol ensure that the Deputy Director is sufficiently competent to perform her supervisory role.[8]

---

[8]We reject the Inmates' assertion that John Byus, the Administrator of Medical and Dental Services for the ADC, is unqualified to supervise the IV team. The record reveals that Byus is an experienced healthcare professional with more than thirty years

Because the Inmates have not presented sufficient evidence to create a genuine issue of material fact about whether they face a substantial risk of serious harm as a result of any deficiencies in the training or experience of the ADC's IV team or its Deputy Director, summary judgment was proper on this issue.

### 6.    Infusion Site Monitoring

The Inmates contend that the Arkansas protocol subjects them to a substantial risk of serious harm by failing to provide for adequate monitoring of the IV infusion sites. The sole piece of evidence they provide in support of this argument is a post-mortem photograph of Steven Hill, which shows his entire body—except his head and hands—covered with a sheet. The Inmates argue that this photograph creates a genuine issue of material fact about whether the protocol prevents adequate monitoring of the IV infusion sites by authorizing the ADC to cover condemned prisoners with sheets during their executions.

The *Baze* plurality noted that in Kentucky "the presence of the warden and deputy warden in the execution chamber with the prisoner *allows* them to watch for signs of IV problems." 128 S. Ct. at 1534 (emphasis added). The Kentucky protocol does not specifically require anyone to monitor the infusion sites, however. *See* Appellants' App. at 528-44; *see also Harbison*, 571 F.3d at 538 (concluding that visually monitoring IV lines "by video camera and through a one-way window" does not violate the Constitution).

The Arkansas protocol expressly requires the Deputy Director to "directly observe the . . . IV infusion site(s)" and to "closely monitor" these sites "throughout

------

of experience as an emergency room technician, licensed practical nurse, Assistant Infirmary Administrator, Supervisor of Medical Services, and Administrator of Medical and Dental Services.

the lethal chemical infusion process." This requirement necessarily precludes ADC personnel from fully covering condemned prisoners with sheets before they are pronounced dead. Moreover, the post-mortem photograph of Hill is not probative of whether the IV infusion sites were visible during his execution. Thus, the Inmates have failed to establish a genuine issue of material fact about the adequacy of infusion-site monitoring under the protocol. *See Gregory v. Rogers*, 974 F.2d 1006, 1010 (8th Cir. 1992) ("A mere scintilla of evidence is insufficient to avoid summary judgment." (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986))).[9]

### 7.    Contingency Plan

If the Deputy Director suspects there is a problem with an infusion site, the protocol requires her to "direct reduction of lethal chemical flow rate or redirect lethal chemical to the secondary or alternative site." The Inmates argue that this contingency plan creates a substantial risk of serious harm because the Deputy Director might order the executioners to administer the syringes of pancuronium bromide and potassium chloride to the secondary IV site without injecting additional doses of sodium pentothal and normal saline. In other words, the Inmates contend that the protocol authorizes the Deputy Director to administer pancuronium bromide and potassium chloride to a prisoner who is not fully unconscious. This argument erroneously assumes that pancuronium bromide and potassium chloride are the only two "lethal chemicals" administered under the protocol. The Inmates' own expert asserted that "[t]wo grams of sodium thiopental is a massive, and potentially lethal,

---

[9]We also note that Charles Carpenter, Hill's former attorney, submitted a declaration in which he described seeing the IV insertion point at Hill's elbow as well as a wide belt covering Hill's chest during the execution. Carpenter's observation is also consistent with nine post-mortem photographs of prisoners (including one of Hill) in the record. In each of these photographs, the prisoner is strapped to the gurney uncovered and the infusion sites are visible.

dose";[10] the Arkansas protocol calls for the injection of three grams of sodium pentothal. *Cf. Cooey v. Strickland*, 589 F.3d at 216, 219 (upholding the Ohio lethal injection protocol, which relies exclusively on a five-gram dose of sodium pentothal to execute prisoners). Indeed, the protocol clearly lists sodium pentothal among the "lethal chemicals" used during executions. The ADC's decision to characterize sodium pentothal as a lethal chemical indicates that it intends all of the chemicals listed in the protocol to be redirected to the secondary IV site.

The Inmates' argument again ignores the protocol's requirement that the Deputy Director ensure the prisoner is fully unconscious before directing the executioners to administer the pancuronium bromide and potassium chloride. The protocol also requires her to administer the back-up doses of sodium pentothal if necessary to render the prisoner completely unconscious. These requirements necessarily prohibit injecting pancuronium bromide and potassium chloride into the secondary IV line before the prisoner is fully unconscious. Moreover, the Hobbs affidavit clarifies that the ADC interprets the protocol to require "the back-up syringes of sodium pentothal and saline flush to be administered before the administration of any remaining pancuronium bromide and potassium chloride," if the need arises for the Deputy Director to redirect the flow of lethal chemicals during an execution. We conclude that the Inmates have failed to create a genuine issue of material fact about whether the protocol's contingency plan subjects them to a substantial risk of serious harm. *Cf. Emmett*, 532 F.3d at 306 (upholding Virginia's lethal injection protocol despite the lack of an explicit requirement to administer a back-up dose of sodium pentothal if it is necessary to inject additional doses of pancuronium bromide or potassium chloride).

---

[10]Sodium pentothal is also known as thiopental. *Baze*, 128 S. Ct. at 1527.

### 8. The Adequacy of the Execution Facility

The Inmates argue that the ADC's execution facility subjects them to a substantial risk of serious harm because the execution chamber is poorly lit, the control room is too small, the syringes are inadequately labeled, and the executioners are not positioned to properly observe the IV infusion sites. The Inmates rely on eleven photographs in the record to support this argument, none of which create a genuine issue of material fact about the adequacy of the execution facility. The photographs show that the syringes are clearly labeled with large numbers and arranged in the carrying case in numerical order. The photographs reveal little, if anything, about the size of the control room, the viewpoint of the executioners, or the adequacy of the lighting. Based on these photographs alone, no reasonable fact finder could conclude that the ADC's execution facility subjects the Inmates to a substantial risk of serious harm, and summary judgment was therefore appropriate. *See Dush v. Appleton Elec. Co.*, 124 F.3d 957, 963 (8th Cir. 1997) ("To avoid the entry of [summary] judgment, it is incumbent upon the nonmoving party to support its case with 'more than a scintilla of evidence.'" (quoting *F.D.I.C. v. Bell*, 106 F.3d 258, 263 (8th Cir. 1997))).

### C. Summary

We hold that the district court did not abuse its discretion in finding that the Inmates' case is ripe for summary judgment. Based on our review of Arkansas's lethal injection protocol, we conclude that it is designed "to avoid the needless infliction of pain, not to cause it." *See Taylor*, 487 F.3d at 1085 (quoting *Workman*, 486 F.3d at 907). Moreover, it is substantially similar to—and perhaps even more thorough than—the Kentucky protocol upheld by the Supreme Court in *Baze*, *see* 128 S. Ct. at 1537, and the Missouri protocol we upheld in *Taylor*, *see* 487 F.3d at 1085. The Inmates have failed to establish a genuine issue of material fact about whether the Arkansas protocol subjects them to a substantial risk of serious harm. On this record,

we hold that the protocol does not violate the Eighth Amendment and that the district court appropriately granted the ADC's motion for summary judgment.

## III.  CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

_____