# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-3070

_____

Leslie Crews; Cary Spiegel; Michael Davis

*Plaintiffs - Appellants*

v.

Monarch Fire Protection District; Kim Evans; Steve Swyers

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: September 8, 2014
Filed: November 18, 2014

_____

Before RILEY, Chief Judge, SMITH and KELLY, Circuit Judges.

_____

RILEY, Chief Judge.

Three ex-fire chiefs—Leslie Crews, Cary Spiegel, and Michael Davis (collectively, chiefs)—appeal the district court's[1] adverse grant of summary judgment on their procedural due process claims challenging the manner of their terminations.

_____

[1]The Honorable Rodney W. Sippel, United States District Judge for the Eastern District of Missouri.

The chiefs' claims focus on the abruptness of the termination decision by Monarch Fire Protection District's (Monarch) board of directors (board) and on two board members' public statements allegedly damaging the chiefs' reputations. With appellate jurisdiction under 28 U.S.C. § 1291, we affirm the grant of summary judgment.

## I.    BACKGROUND
### A.    Factual Background

In 2011, the Missouri Court of Appeals upheld a jury verdict against Monarch in an employment discrimination lawsuit filed by some of Monarch's female firefighters. See Kessler v. Monarch Fire Prot. Dist., 352 S.W.3d 677 (Mo. Ct. App. 2011) (per curiam). Four days after the decision was filed, Monarch's board held a closed, special meeting. Of Monarch's three directors—Kim Evans, Steve Swyers, and Robin Harris—only Evans and Swyers were physically present. Harris participated by telephone, but for this reason was unable to vote. During the meeting, the board voted to request the resignations of several of Monarch's high-ranking officers (including the chiefs) with the understanding that absent a resignation, the board would vote to terminate each chief's employment. Charles Billings, Monarch's attorney, informed Fire Chief Clifford Biele, Monarch's first-in-command under the board, of this decision and provided Chief Biele with resignation letters for the chiefs to sign.

Chief Biele called Crews and Spiegel (the only two present at the time) into his office and informed them of the board's decision. He explained the board voted to discharge the chiefs in light of the sexual discrimination found to have occurred at Monarch, and he informed Crews and Spiegel they would be terminated if they did not sign the resignation letters. Billings also spoke with Crews and Spiegel, explaining the decision was due to the recent Missouri appellate decision. Crews and Spiegel asked for time to think over their options, and after spending about a half hour in their own offices, they returned to Chief Biele and refused to resign. They

maintained "there was no reason for them to resign" and they were being "wrongfully terminated." Two police officers who were standing by then escorted Crews and Spiegel off the premises.

Chief Biele telephoned Davis, who was off duty at the time, and gave him the same news and option to resign. After taking time to consider, Davis called back and refused to resign.

Several days later, the full board met again in an open, public meeting where it voted to ratify the chiefs' termination.[2] Harris, the third director, voiced his disagreement, but the termination decision was confirmed nonetheless. During the public meeting, Swyers and Evans defended their decision by relying on the Missouri appellate decision's description of Monarch as creating an environment "of abusive, hostile discrimination against female employees."[3] Monarch posted the minutes of that meeting on its official website. The chiefs also identify several online news articles attributing statements to Swyers and Evans that indicate the chiefs were discharged for promoting an environment of unacceptable discrimination. The chiefs never requested a hearing to respond to these statements.

### B. Procedural Background

The chiefs brought this 42 U.S.C. § 1983 action, alleging Evans and Swyers, individually, and Monarch violated the Fourteenth Amendment's Due Process Clause by discharging the chiefs and disparaging their reputations. Monarch, Evans, and

---

[2]The minutes indicate that a closed meeting was held immediately before the open meeting and the board discussed and voted on the termination in that closed session. The vote at the public meeting purported to ratify publicly the earlier decision.

[3]While the published per curiam order does not elaborate on the details of the case, it mentions the court "provided the parties a memorandum setting forth the reasons for [its] decision." Kessler, 352 S.W.3d at 677.

Swyers moved for summary judgment, and the district court granted the motion, concluding (1) the chiefs, as at-will employees, held no property interest in their continued employment; (2) the chiefs forfeited their loss-of-liberty interest claim by failing to request a name clearing hearing; and (3) any constitutional violations were not "clearly established," precluding individual liability for Evans and Swyers. The chiefs timely appealed.

## II.   DISCUSSION

A party seeking summary judgment must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "We review *de novo* the district court's grant of summary judgment, viewing the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." Petroski v. H & R Block Enters., LLC, 750 F.3d 976, 978 (8th Cir. 2014).

### A.   Due Process

The Fourteenth Amendment pronounces, "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The chiefs claim Monarch deprived them of their property (continued employment) and liberty (reputation) interests without affording them due process.[4] See Christiansen v. W. Branch Cmty. Sch. Dist., 674 F.3d 927, 934 (8th Cir. 2012) (characterizing property and liberty interests).

#### 1.   Termination

To establish a constitutionally protected deprivation of property, the chiefs must show they each held "'a property right in continued employment.'" Floyd-Gimon v. Univ. of Ark. for Med. Scis. ex rel. Bd. of Trs. of Univ. of Ark., 716 F.3d 1141, 1146

---

[4]The parties agree Monarch, as a Missouri fire protection district, is a political subdivision of the state of Missouri. See S. Metro. Fire Prot. Dist. v. City of Lee's Summit, 278 S.W.3d 659, 661 (Mo. 2009) (en banc).

-4-

(8th Cir. 2013) (quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985)).  Here, the property interest depends on Missouri state law, see id., which presumes the chiefs were at-will employees, terminable at any time and "'for any reason or for no reason,'" Margiotta v. Christian Hosp. Ne. Nw., 315 S.W.3d 342, 345-46 (Mo. 2010) (en banc) (quoting Crabtree v. Bugby, 967 S.W.2d 66, 70 (Mo. 1998) (en banc), overruled on other grounds by Templemire v. W & M Welding, Inc., 433 S.W.3d 371 (Mo. 2014) (en banc)).  Because at-will status under Missouri law dooms their claim of a property interest, see Hess v. Ables, 714 F.3d 1048, 1053 (8th Cir. 2013); Greeno v. Little Blue Valley Sewer Dist., 995 F.2d 861, 864 (8th Cir. 1993), the chiefs must overcome this state law presumption.

Admitting they "did not have express employment contracts," the chiefs rely on Daniels v. Board of Curators of Lincoln University, 51 S.W.3d 1 (Mo. Ct. App. 2001), to argue Monarch implicitly promised not to terminate the chiefs without good cause.  The chiefs maintain this implicit guarantee modifying their at-will status stemmed from Monarch's internal rules and regulations, which refer to the chiefs' positions as "permanent employees," implement progressive discipline procedures and an expected minimum level of disciplinary review, and indicate termination should only be for cause.

In Daniels, the appeals court "address[ed] whether the [employer's] customs, practices and de facto policies established a property interest in" continued employment for the employee.  Daniels, 51 S.W.3d at 7.  The court concluded the employer's historical practices and employee handbook implicitly "promise[d] that termination would not occur without good cause" and this understanding between employer and employee "was the genesis of a property interest protected by the 14th Amendment."  Id. at 10.  The Daniels court reached this conclusion by relying primarily on Winegar v. Des Moines Independent Community School District, 20 F.3d 895, 899 (8th Cir. 1994), and Perry v. Sindermann, 408 U.S. 593, 602-03 (1972), for the proposition that under the Due Process Clause, "[a] property interest in

-5-

employment can . . . be created by implied contract, arising out of customs, practices, and de facto policies," Winegar, 20 F.3d at 899. See Daniels, 51 S.W.3d at 7-8.

The Daniels court and the chiefs' reliance on these cases is misplaced. Winegar establishes only that a constitutionally protected interest "*can . . .* be created by implied contract," allowing this as one of many methods by which state law might establish a property interest. Winegar, 20 F.3d at 899 (emphasis added). The Perry decision similarly reminds readers that its holding did *not* find a "legitimate claim of entitlement to job tenure" because "'[p]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" Perry, 408 U.S. at 602 n.7 (omission in original) (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). These cases only show the potential breadth of the Fourteenth Amendment's use of the term "property" *if* such property interests are created by some independent source. We may not—as the chiefs might have us do—circumvent the *state law* inquiry critical to determining whether a property interest exists: whether, under Missouri law, the chiefs remained at-will employees, terminable at any time. See Bishop v. Wood, 426 U.S. 341, 344 (1976) ("A property interest in employment can, of course, be created by ordinance, or by an implied contract. In either case, however, the sufficiency of the claim of entitlement must be decided by reference to state law.").

In Missouri, an employee can be terminated at the will of his employer unless a valid employment contract—complete with "offer, acceptance, and bargained for consideration"—states otherwise. Johnson v. McDonnell Douglas Corp., 745 S.W.2d 661, 662 (Mo. 1988) (en banc); see also Doran v. Chand, 284 S.W.3d 659, 664 (Mo. Ct. App. 2009) (requiring these elements for an employment contract and explaining an "offer to modify an employee's at will status must be clear and definite"). Despite the chiefs' contentions, the simple existence of Monarch's internal rules does not imply an enforceable employment contract. See Greeno, 995 F.2d at 864. In Johnson,

the Missouri Supreme Court held an employer's unilateral publication of employee handbooks or internal rules and regulations does not constitute an offer to modify an employee's at-will status, and therefore fails to do so, where the handbook amounts to nothing more than "an informational statement of" the employer's "self-imposed policies." Johnson, 745 S.W.2d at 662.

Here, Chief Biele retained the authority to interpret Monarch's rules, and past practices show the board amended the rules of its own accord. See, e.g., Johnson, 745 S.W.2d at 662 (noting the employer retained interpretive and amendatory power). There is no evidence the chiefs or other Monarch employees negotiated the provisions of the rules during their hiring processes or that employees approved or negotiated the board's changes. Nothing on the record shows the elements of an enforceable contract. Even assuming the rules were once officially adopted by the board, the rules appear to be nothing more than a set of unilateral, "self-imposed policies," and "a reasonable at will employee could not interpret its distribution as an offer to modify his at will status." Id.; see also Greeno, 995 F.2d at 864 (recognizing "[t]he Missouri Supreme Court has held that employee handbooks cannot alter or modify employment at will status" (citing Johnson, 745 S.W.2d at 663)). Thus, the chiefs remained at-will employees.

The chiefs confront Johnson by urging its holding is outmoded and claiming the court of appeals decision in Daniels represents a trend in Missouri toward recognizing less formal means of excepting employees from at-will status. Daniels, they maintain, is how the Missouri Supreme Court would today address the impact of internal policies on the at-will doctrine. History belies this contention. The chiefs fail to cite any other Missouri decision concluding employer policies or customs override the at-will presumption. Our own research reveals only one opinion, in the nearly fourteen years since Daniels, which can be seen as relying, at least partially, on Daniels's approach. See Kixmiller v. Bd. of Curators of Lincoln Univ., 341 S.W.3d 711, 715 (Mo. Ct. App. 2011). On the other hand, the Missouri Supreme Court holds true to

its rule that an employment *contract* is necessary to alter at-will status. See Baker v. Bristol Care, Inc., ___ S.W.3d. ___, ___, No. SC93451, 2014 WL 4086378, at *3 (Mo. Aug. 19, 2014) (en banc). And Missouri courts of appeals still conclude that "'[u]nder Missouri law, employee handbooks generally are not considered contracts because they normally lack the traditional prerequisites of a contract.'" Johnson v. Vatterott Educ. Ctrs., Inc., 410 S.W.3d 735, 738 (Mo. Ct. App. 2013) (quoting McIntosh v. Tenet Health Sys. Hosps., Inc., 48 S.W.3d 85, 89 (Mo. Ct. App. 2001)); accord Doran, 284 S.W.3d at 664. We see no new trend and no reason to deviate from Missouri's long established at-will and employment contract rules.

Because the chiefs were terminable at the will of their employer, they had no property interest in their continued employment under the Fourteenth Amendment. See Hess, 714 F.3d at 1053.

## 2.    Disparaging Remarks

Having no property interest, at-will employees are only entitled to a hearing in connection with their discharge if the employer "creates and disseminates a false and defamatory impression about the at-will employee in connection with the discharge." Speer v. City of Wynne, Ark., 276 F.3d 980, 984 (8th Cir. 2002). To prevail on this liberty interest claim, the chiefs "must demonstrate: '(1) an official made a defamatory statement that resulted in a stigma; (2) the defamatory statement occurred during the course of terminating the employee; (3) the defamatory statement was made public; and (4) an alteration or extinguishment of a right or legal status.'" Crooks v. Lynch, 557 F.3d 846, 849 (8th Cir. 2009) (citation omitted) (quoting Brown v. Simmons, 478 F.3d 922, 923 (8th Cir. 2007)). To recover for the lack of a post-termination name clearing hearing, the chiefs also "must prove [they] sought one before litigation." Winskowski v. City of Stephen, 442 F.3d 1107, 1112 (8th Cir. 2006). The chiefs' claim fails from the start, because they have not identified any admissible evidence containing a sufficiently stigmatizing statement.

-8-

### a. Admissible Evidence

At summary judgment, the requisite "genuine dispute," Fed. R. Civ. P. 56(a), must appear in *admissible* evidence. See Nooner v. Norris, 594 F.3d 592, 603 (8th Cir. 2010). As evidence of Evans's and Swyers's injurious statements, the chiefs offer the minutes of the open Monarch board meetings and news media articles purporting to quote or paraphrase Evans and Swyers. The newspaper articles are "'rank hearsay'" that do not fit a hearsay exception. Id. (quoting Miller v. Tony & Susan Alamo Found., 924 F.2d 143, 147 (8th Cir. 1991)); see also Jones v. McNeese, 746 F.3d 887, 899 (8th Cir. 2014). While the allegedly defamatory statements themselves may not be hearsay, see Fed. R. Evid. 801(c)(2), (d)(2)(A), the second level—each newspaper's out-of-court assertion that Evans and Swyers in fact made these statements—is hearsay. See Jones, 746 F.3d at 899; Nooner, 594 F.3d at 603. We will consider only the statements in the board meetings' minutes.

### b. Stigmatization

The chiefs challenge statements made in two public board meetings. In one of the meetings, Swyers justified the decision to terminate the chiefs by explaining Monarch had "created an atmosphere, as stated in the Appellate Court, of abusive, hostile discrimination against female employees." At other points during the meetings, Swyers explained to the board and the public that the Missouri Court of Appeals had described Monarch's workplace as "hostile, pervasively discriminating and abusive." Evans similarly quoted the Missouri court's decision as stating "[t]he harassment was evasive [sic] enough to create an abusive work environment." Evans explained the board does not "tolerate an abusive work environment" and Monarch "do[es] not promote discrimination in [its] workplace." According to Evans, the chiefs' terminations sent this message.

"For a defamatory statement to be actionable under § 1983, it must go beyond 'alleging conduct [by the plaintiff] that fails to meet professional standards'" and instead "must 'damage[] a person's standing in the community or foreclose[] a person's freedom to take advantage of other employment opportunities.'" Jones, 746

F.3d at 898 (alterations in original) (quoting <u>Raposa v. Meade Sch. Dist. 46-1</u>, 790 F.2d 1349, 1354 (8th Cir. 1986)). "The stigma must be significant, and it usually involves allegations of dishonesty, immorality, racism, or a similar character-demeaning charge." <u>Howard v. Columbia Pub. Sch. Dist.</u>, 363 F.3d 797, 802 (8th Cir. 2004). We have "distinguished claims of general misconduct or unsatisfactory performance from claims involving *direct* dishonesty, immorality, criminality or racism." <u>Stodghill v. Wellston Sch. Dist.</u>, 512 F.3d 472, 477 (8th Cir. 2008) (emphasis added).

In <u>Mascho v. Gee</u>, 24 F.3d 1037, 1039 (8th Cir. 1994), the employer publicly accused a supervisor of "not performing the functions of a supervisor" and "fail[ing] to comply with the spirit of the drug-free workplace policy by failing to report suspected drug usage." Though the supervisor was said to have looked the other way when confronted with criminal conduct, "we characterized this as an accusation of unsatisfactory performance"—he was just an inept supervisor. <u>Stodghill</u>, 512 F.3d at 477 (discussing <u>Mascho</u>). In <u>Stodghill</u>, a school administrator claimed to be stigmatized by statements that in recent years "[c]heating had occurred in" his school district. <u>Id.</u> We reasoned this statement was "not a direct assault on [the administrator's] honesty," but instead "challenge[d the administrator's] performance in effectively overseeing the district"—the accusation "simply stated cheating occurred *on his watch*." <u>Id.</u>

As in <u>Stodghill</u> and <u>Mascho</u>, Evans and Swyers focused on the discriminatory environment of the fire district and on the chiefs' failure to stop the discrimination or implement effective anti-discrimination policies. We find no instance in which either director accused the chiefs of direct discrimination or harassment, nor is there any clear statement that any of the chiefs condoned the harassment for which they were fired. In every instance of alleged defamation, neither Evans nor Swyers purported to assess independently the character or conduct of the chiefs, because each only

paraphrased the Missouri court's description of the workplace. There was no stigma sufficient to deprive the chiefs of a liberty interest.

### B.     Individual Capacity Claims

The chiefs' individual capacity claims against Swyers and Evans allege the same violations of the Fourteenth Amendment. Having found no constitutional deprivation, Swyers and Evans are entitled to qualified immunity. See Hawkins v. Gage Cnty., Neb., 759 F.3d 951, 956 (8th Cir. 2014).

## III.     CONCLUSION

For these reasons, we affirm.

_____