# United States Court of Appeals

## For the Eighth Circuit

_____

No. 15-1313

_____

American Home Assurance Company; Cargill Meat Solutions Corporation

*Plaintiffs - Appellees*

v.

Greater Omaha Packing Co., Inc.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: October 20, 2015
Filed: April 5, 2016

_____

Before WOLLMAN, BEAM, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Cargill Meat Solutions Corporation (Cargill) and American Home Assurance Company filed suit against Greater Omaha Packing Company, Inc. (Greater Omaha), alleging breach of contract and warranties.[1] Cargill claimed that Greater Omaha sold

_____

[1]American Home Assurance Company is Cargill's insurer. It did not participate at trial and merely has joined Cargill's opposition to this appeal.

raw beef trim tainted with *E. coli* O157:H7, which Cargill then used in its ground beef products, causing several people to become ill. Greater Omaha counterclaimed for tortious interference with business relationships and expectancies. The district court[2] granted summary judgment in favor of Cargill on Greater Omaha's counterclaim. Following a three-week trial, the jury returned a general verdict for Cargill and awarded $9 million in damages. On appeal, Greater Omaha argues that the district court erred in admitting certain evidence, that the jury instructions were improper, that the jury reached an impermissible compromise verdict, and that Greater Omaha's counterclaim should have survived summary judgment. We affirm.

## I. Background

*E. coli* O157:H7 bacteria live in the digestive tracts of cows and can be transferred to meat during slaughter. Humans become infected by consuming contaminated beef, and the O157:H7 strain is so virulent that even a small dose can make a person ill. Unlike the harmless *E. coli* bacteria commonly found in human intestines, *E. coli* O157:H7 produces Shiga toxins, which cause inflammation of the colon and large intestine, resulting in stomach cramps and bloody diarrhea. Hemolytic uremic syndrome is a severe complication of *E. coli* O157:H7 infection that can cause anemia and kidney damage.

When infected patients seek treatment, health care providers report the cases of *E. coli* O157:H7 to state health departments, and clinical laboratories send bacterial isolates to state public health laboratories for pulsed-field gel electrophoresis (PFGE), which is a method of DNA fingerprinting. State health departments then submit the PFGE results to the Centers for Disease Control and Prevention's (CDC) national

---

[2]The Honorable Lyle E. Strom, United States District Judge for the District of Nebraska.

molecular subtyping database, PulseNet, which helps detect outbreaks of foodborne disease.

In September and October 2007, the Minnesota Department of Health (MDH) received several reports of cases of *E. coli* O157:H7. Clinical laboratories sent bacterial isolates to the MDH for two-enzyme PFGE testing. The results revealed that the Minnesota cases had indistinguishable PFGE patterns. MDH submitted the results to PulseNet, and the Minnesota cases were considered to be part of an existing national outbreak of *E. coli* O157:H7, consisting of cases having the same PFGE pattern. Although the outbreak's PFGE pattern was rare, it had been reported to the CDC in 2005 and 2006.

According to the supervisor of the foodborne diseases unit in the MDH, "when isolates of bacteria from different people have the same DNA fingerprint, that suggests that they -- the people may have acquired their illness from a common source." Several Minnesota patients reported having consumed the same brand of frozen hamburger patties from Sam's Club—American Chef's Selection Angus Beef Patties—which was produced by Cargill. State officials collected leftover patties and packaging materials from those patients and tested the patties for the presence of *E. coli* O157:H7. That testing revealed that the human and ground beef bacterial isolates had the same two-enzyme PFGE pattern, and packaging materials indicated that the patties were produced within minutes of each other on two production lines in the same facility. Accordingly, on October 5, 2007, the MDH issued a news release, instructing the public to discard or return to Sam's Club any American Chef's Selection Angus Beef Patties.

Meanwhile, the U.S. Department of Agriculture's Food Safety and Inspection Service (FSIS) notified Cargill of the *E. coli* O157:H7 outbreak. Cargill determined that the contaminated patties were produced at its Butler, Wisconsin, beef grinding facility on August 16, 2007. Angie Siemens, Ph.D., then Vice President of Technical

Services, served as Cargill's recall coordinator. She traveled to the Butler facility to work with the on-site technical services team and FSIS officials to determine the scope of the recall. On October 6, 2007, Cargill recalled 845,000 pounds of frozen ground beef.

Cargill had used raw materials from the following four suppliers in its August 16 production: Greater Omaha; Beef Products, Inc. (BPI); Lone Star Beef Processors (Lone Star); and Frigorifico PUL (Frigorifico), a foreign company. Greater Omaha produced the raw beef trim included in this production on August 9 and 10, 2007. Cargill contacted the four suppliers the same day it announced the recall.

Although the four suppliers had submitted to Cargill certificates of analysis showing that samples of their beef had tested negative for *E. coli* O157:H7, it is undisputed that raw materials caused the contamination. To determine the source of the contamination, Cargill reviewed microbiological data from the suppliers and sent personnel to visit the domestic suppliers. Cargill learned from its audit of Greater Omaha's *E. coli* sampling procedures that Greater Omaha had been testing a new sampling procedure that, according to Cargill, did not comply with the procedure Cargill required. Cargill claimed that when Greater Omaha resumed using the appropriate method in October 2007, Greater Omaha experienced a spike in *E. coli* O157:H7-positive samples. On December 5, 2007, Cargill threatened to delist the Greater Omaha plant if it did not improve its process control or institute corrective actions. Greater Omaha's December 18, 2007, response outlined the improvements that it had made, including that it had modified its sampling procedures.

In early October 2007, FSIS also notified Greater Omaha that its beef had been used in the Cargill patties that had tested positive for *E. coli* O157:H7. Thereafter, in December 2007, FSIS completed a comprehensive review of Greater Omaha's food-safety systems, documenting several instances of non-compliance with federal regulations. Because it had failed to maintain adequate sanitary conditions in its

facility, FSIS issued a Notice of Intended Enforcement (NOIE) to Greater Omaha on December 20, 2007. The NOIE stated that from June 1, 2007, to November 29, 2007, Greater Omaha had "failed to meet regulatory requirements for pre-operational sanitation, on average, 48% of the time." FSIS thus concluded that the recurring non-compliance "indicate[d] failure to properly implement [Greater Omaha's] sanitation program." The NOIE also addressed a spike in *E. coli* O157:H7-positive results from Greater Omaha samples from mid-October to early November 2007. In its response to FSIS, Greater Omaha attributed the spike to a fan that had been placed on the kill floor and was subsequently removed.

The CDC created a line list[3] for the *E. coli* O157:H7 outbreak, using data provided by state health departments. The line list included information about fifty-four case patients, all of whom had the same strain of *E. coli* O157:H7. The spreadsheet had fields for the patient's age, sex, onset date, symptoms, and food history. Because the most common vehicle for *E. coli* O157:H7 is beef, the spreadsheet also included fields for brands, types, and purchase dates of any beef consumed by the case patient.

Of the fifty-four cases on the line list, twenty-seven case patients reported exposure to American Chef's Selection Angus Beef Patties. Of the twenty-seven case patients who had not been exposed to the Cargill patties, the line list included no food-history information for fourteen cases and varying degrees of food-history information for the remaining thirteen cases. Among the thirteen case patients who reported some food history, two young boys from Ohio had fallen ill before August 9, 2007, and three individuals—from Hawaii, Missouri, and New York—reported exposure to beef that could be traced back to Greater Omaha. When Dr. Siemens reviewed the CDC's line list and discovered a case patient who had not been exposed to the Cargill patties

---

[3]A line list is a spreadsheet that includes information about case patients associated with a foodborne-disease outbreak.

but who had consumed other Greater Omaha beef, she concluded that Greater Omaha's raw beef trim was the source of the contamination.

The Hawaii case patient was a seven-year-old girl who had consumed a raw beef dish at a restaurant on August 30, 2007. She became ill four days later and was diagnosed with *E. coli* O157:H7. PFGE testing revealed that the Hawaii case patient had the same PFGE pattern as the Minnesota case patients, and further genetic subtyping, known as multiple locus variable-number tandem repeat analysis (MLVA), revealed that she also had the same MLVA results as the Minnesota case patients. The restaurant identified the cuts of beef that may have been used in the girl's meal and reported that it had received those cuts from a distributor in California. That distributor identified Greater Omaha as the source of the beef that it had shipped to the restaurant on August 16 and 18, 2007. The distributor had not shipped any beef from BPI, Lonestar, or Frigorifico to the restaurant. According to Greater Omaha's records, it had produced the beef on August 9, 2007.

A twenty-four-year-old man in Missouri became ill on September 14, 2007, with the same strain of *E. coli* O157:H7 as the Minnesota case patients. He reported that he regularly purchased ground beef from Schnucks, a grocery store that grinds its beef in-house. Schnucks had not purchased or received raw beef from BPI, Lonestar, or Frigorifico during the time period relevant to the outbreak, but it had purchased raw beef from Greater Omaha, including a shipment sent by Greater Omaha on August 10, 2007.

On September 16, 2007, a sixteen-year-old girl attending boarding school in upstate New York ate a hamburger at a school picnic. She became ill days later, and tests confirmed that she had the same strain of *E. coli* O157:H7 as the Minnesota case patients. The school had purchased the hamburger patties from a distributor of Farmland Food patties. The distributor had purchased the patties from Rochester Meat Company, which produced the patties on August 16, 2007, using raw beef from

Greater Omaha. Rochester Meat Company had not used raw beef from BPI, Lonestar, or Frigorifico to make the patties. Using invoices and shipment records, the hamburger patty was traced from the school picnic to Greater Omaha's August 9, 2007, beef production.

Cargill entered into nine settlement agreements related to personal injuries caused by the contaminated American Chef's Selection Angus Beef Patties, paying out $25,270,768.50. Cargill also incurred $548,604.51 in business costs related to the recall. Cargill filed the present suit against Greater Omaha in August 2011, alleging five counts: breach of express warranty, breach of implied warranty of merchantability, breach of implied warranty of fitness for a particular purpose, breach of contract, and indemnity.[4] The complaint identified a guarantee dated June 2, 2006, wherein Greater Omaha guaranteed, in relevant part, that "all articles comprising each shipment or other delivery to [Cargill] as of the date of shipment or delivery, will . . . [n]ot be adulterated or misbranded within the definitions provided in the Meat Inspection Act, Federal Food, Drug and Cosmetic Act, or any amendment thereof." In the breach-of-contract count, Cargill alleged that Greater Omaha breached the terms of the June 2 guarantee when it shipped raw beef trim that was tainted with *E. coli* O157:H7. As discussed more fully below, Greater Omaha filed a counterclaim for tortious interference with business relationships and expectancies, which, as earlier indicated, was dismissed at summary judgment.

Before trial, Cargill identified as experts Dr. Siemens and two professors of epidemiology, Lee Harrison, M.D., and Randall Singer, Ph.D. Drs. Harrison and Singer concluded that Greater Omaha beef was the source of the *E. coli* O157:H7 outbreak, based on their analysis of molecular data connecting the case patients to the outbreak, state health department records, and supply-chain traceback data.

---

[4]The district court granted Cargill's pretrial motion to dismiss its indemnity claim.

According to the pretrial written reports of Drs. Harrison and Singer, molecular data indicated that the *E. coli* O157:H7 likely originated from the same source. Dr. Harrison's report stated that "[b]acterial isolates that have the same DNA fingerprint are presumed to be genetically highly related and therefore from the same source." Similarly, Dr. Singer's report stated that if two isolates have the same PFGE pattern, "[t]he isolates are very similar (and possibly identical) and might be derived from the same [s]ource." Dr. Harrison found the molecular data from the Hawaii case particularly compelling, noting that the matching two-enzyme PFGE pattern, along with identical MLVA, constitute "exceedingly strong evidence that [the case patients] got their infection from the same source." He explained that MLVA "is able to further discriminate among *E. coli* O157:H7 isolates that appear to be the same by two-enzyme PFGE."

A traceback investigation begins with the case patient's food history. Because symptoms of *E. coli* O157:H7 infection typically begin several days after exposure to the bacteria, the case patient's food history also must go back several days. After identifying the vehicle that likely caused the person to become ill, the investigation works its way back through the supply chain to try to determine the source of the contamination. As Dr. Harrison explained,

> [P]urchase and shipment documents are reviewed to trace back from where the case patients purchased or consumed the product, then to the suppliers/distributors of the product, and then to the processor and producers. . . . In the case of a meat-related outbreak, the traceback often leads to the slaughterhouse from where the contaminated meat originated.

Dr. Singer noted that traceback investigations can be difficult because people often cannot remember what they ate before they became ill.

Drs. Harrison and Singer cited the Hawaii, Missouri, and New York cases as evidence that Greater Omaha was the source of the *E. coli* O157:H7 outbreak. Traceback investigations for each of those cases led to beef produced by Greater Omaha and ruled out beef produced by BPI, Lonestar, or Frigorifico. Greater Omaha's experts asserted that Drs. Harrison and Singer had cherry-picked those three cases and ignored the Ohio cases. Dr. Singer responded that he investigated all fifty-four cases and looked for epidemiological data that might link the cases together. Dr. Harrison explained that cases with incomplete information do not always allow a traceback investigation from vehicle to source. The more complete data from the Hawaii, Missouri, and New York cases allowed for the investigation to begin with the likely vehicles and to trace back to a common source, Greater Omaha. Dr. Harrison further explained that there was no apparent epidemiological link between the Ohio cases and the known outbreak cases, nor had the Ohio cases undergone MLVA, the more discerning of the genetic subtyping methods.

Greater Omaha moved *in limine* to exclude the expert testimony of Drs. Siemens, Harrison, and Singer. The district court denied the motion, rejecting Greater Omaha's argument that the experts had ignored all but the Hawaii, Missouri, and New York cases in formulating their opinions. The district court concluded that although Cargill's experts could not account for every patient's source of illness, "[i]t does not follow that the Expert Witnesses ignored facts because they failed to account for each patient's illness through analysis." D. Ct. Order of April 16, 2014, at 8.

Trial commenced on September 8, 2014. Several witnesses testified regarding the 2007 *E. coli* O157:H7 outbreak, the identification of the Cargill patties as the vehicle for many case patients, and the recall. Dr. Siemens testified regarding Cargill's investigation into the contamination and her conclusion that Greater Omaha's raw materials contaminated the Cargill patties. Drs. Harrison and Singer also opined that Greater Omaha was the source of the *E. coli* O157:H7 bacteria found in the Cargill patties. Greater Omaha's expert testified that the Ohio cases indicated that

Greater Omaha was not the source of the outbreak. Over Greater Omaha's objection, the district court admitted the NOIE that FSIS had issued to Greater Omaha in December 2007.

To establish its damages, Cargill submitted evidence of the sums that it paid to settle outbreak-related claims and of the business costs related to the recall. The attorney who mediated the settlement agreements testified that the sums Cargill paid were reasonable. On cross-examination, Greater Omaha suggested that Cargill sought to settle the cases for business and reputation reasons, advancing the theory it had introduced during opening statements to the effect that the settlement amounts were unreasonable and "driven by factors not related to the nature and extent of the [*E. coli* O157:H7] illness." At the close of Cargill's case-in-chief, the district court denied Greater Omaha's motion for judgment as a matter of law.

Cargill suggested in its proposed jury instructions that the June 2 guarantee—along with several other documents—constituted the contract. Greater Omaha objected, arguing that the guarantee alone constituted the contract and that Cargill's proposed instruction had the effect of amending the complaint. The district court overruled Greater Omaha's objection and submitted an instruction that explained that the parties disputed which documents made up the contract. The instruction set forth both parties' positions and charged the jury with deciding "what constitutes the parties' contract, and which of the parties' interpretations of that contract is correct." The instruction that set forth Cargill's breach-of-contract claim, however, referred only to the June 2, 2006, guarantee.

The district court also denied Greater Omaha's request for an instruction on the exclusion or modification of implied warranties, rejecting Greater Omaha's argument that its invoices excluded any warranties and limited any damages to the purchase price or the cost of replacing the goods.

-10-

The jury received the case shortly after noon on Friday, September 26, 2014. It deliberated until 4:30 p.m. that afternoon and reconvened at approximately 9:00 a.m. on Monday, September 29. The jury reached its verdict at 9:30 a.m., returning a general verdict in favor of Cargill for $9 million. The district court denied Greater Omaha's renewed motion for judgment as a matter of law and its alternative motion for a new trial.

## II. Discussion

### A. Expert Evidence

Greater Omaha first argues that the district court erred in admitting the testimony of Drs. Harrison and Singer. We review the decision to admit expert evidence for abuse of discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 143 (1997). The opinion of a qualified expert witness is admissible if (1) it is based on sufficient facts or data, (2) it is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The expert's scientific, technical, or specialized knowledge must also "assist the trier of fact to understand the evidence or determine a fact in issue." Id. The district court is thus vested with a gatekeeping function, ensuring that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993).

Greater Omaha contends that the methodology of Drs. Harrison and Singer was flawed because they ignored the two case patients from Ohio who fell ill on July 31 and August 1—several days before Greater Omaha produced the meat that allegedly contaminated the Cargill patties. Because the Ohio case patients' illness could not be attributed to the Greater Omaha product that was used in the Cargill patties, the argument goes, the Ohio cases proved that the source of *E. coli* O157:H7 outbreak was not Greater Omaha.

-11-

Greater Omaha's argument begins with the premise that the fifty-four cases of *E. coli* O157:H7 listed on the CDC's line list share the same source because they have indistinguishable PFGE patterns. According to Drs. Harrison's and Singer's reports and testimony, a common PFGE pattern constitutes evidence that the bacteria causing the illnesses may have derived from the same source, but *E. coli* O157:H7 cases that derive from different sources can have indistinguishable PFGE patterns. According to Cargill's experts, the PFGE pattern must be considered along with the epidemiological information. As Dr. Singer testified, "We need to know about the timing of the infections. We need to know where they got infected. We need to know their exposure, so what foods did they consume? We collect all of this additional information to establish what we would call the epidemiological relatedness."

Drs. Harrison and Singer testified that they could not find an epidemiological link between the Ohio cases and the rest of the cases associated with the outbreak. They explained that they did not ignore the Ohio cases, but rather were unable to trace those cases back to their source. Reviewing the information from the twenty-seven case patients who had not been exposed to Cargill patties, Dr. Harrison testified that he tried to find a common denominator, *i.e.*, had any of those case patients consumed beef that could be traced back to one of Cargill's four suppliers? The answer, he found, was yes, three cases—from Hawaii, Missouri, and New York—traced back to Greater Omaha. Similarly, Dr. Singer explained that his traceback investigation involved all fifty-four cases from the line list:

> [A]s an epidemiologist, I start with the illnesses and then I work backwards to try to understand the exposures that they had, the vehicles that may have caused their illness. . . . I need to look at all 54 illnesses in order to work backwards and see what was their likely exposure, what was the likely vehicle that caused the infection, and can I relate them epidemiologically. The only way to do that is to review all of the illnesses that are on the line list.

Dr. Singer testified that he had "traced back all 27 [cases not linked to Cargill] and ha[d] sufficient information for three of them." He traced the cases from Hawaii, Missouri, and New York back to Greater Omaha.

That Greater Omaha's August 9 or 10, 2007, beef production could not have caused the two Ohio case patients' *E. coli* O157:H7 infections does not invalidate the experts' conclusion that the Greater Omaha production was the source of the *E. coli* O157:H7 bacteria found in the Cargill patties. As mentioned above, the PFGE pattern identified in the outbreak was rare, but it had previously been reported to the CDC. Moreover, Greater Omaha cites no scientific literature or expert testimony to support its argument that Cargill's experts' methodology was flawed. The district court did not abuse its discretion in determining that the expert evidence met the standard for admissibility and that the evidence of the Ohio cases was best used for impeachment and cross-examination. Accordingly, we find no error in the admission of the Dr. Harrison's and Dr. Singer's testimony.

Greater Omaha also argues that the expert testimony of Dr. Siemens should have been excluded because she is not an epidemiologist and she merely restated the opinions of the other experts. Dr. Siemens, however, had investigated the source of the *E. coli* O157:H7 immediately after the outbreak and reached the conclusion that Greater Omaha's product caused the contamination, and so the district court did not err in admitting her testimony.

## B. Admission of December 2007 NOIE

Greater Omaha argues that the district court erred in admitting the original and revised December 2007 NOIE and Greater Omaha's response thereto. Greater Omaha contends that the documents were not relevant and, even if they were, any probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues. We review a district court's decision to admit evidence for clear and

prejudicial abuse of discretion. Smith v. Tenet Healthsystem SL, Inc., 436 F.3d 879, 885 (8th Cir. 2006). We find none here.

The NOIE broadly addressed Greater Omaha's sanitation program from June to November 2007, finding that Greater Omaha had failed to meet certain sanitation requirements almost as often as it had met them. That information tended to prove that Greater Omaha failed to maintain sanitary conditions at its plant in August 2007, when it produced the raw beef trim that was used in the Cargill patties. The district court thus did not abuse its discretion in determining that the December 2007 NOIE and related documents were relevant. See Fed. R. Evid. 401. The NOIE also addressed a spike in *E. coli* O157:H7-positive samples that occurred in October and November 2007. Although Greater Omaha attributed the spike to a fan placed on the kill floor, the removal of which allowed the *E. coli* O157:H7 results to return to normal, Cargill attributed the spike to Greater Omaha's non-compliant sampling procedure that, once corrected, resulted in more accurate *E. coli* O157:H7 test results. We cannot say that the district court committed clear and prejudicial abuse of discretion when it determined that the probative value of the documents was not substantially outweighed by a danger of unfair prejudice or confusion of the issues. See Fed. R. Evid. 403.

## C. Jury Instructions

Greater Omaha argues that it is entitled to a new trial because the district court erroneously charged the jury with deciding which documents constituted the parties' contract and failed to give an instruction on the exclusion or modification of implied warranties. We review the district court's rulings on jury instructions for abuse of discretion. M.M. Silta, Inc. v. Cleveland Cliffs, Inc., 572 F.3d 532, 536 (8th Cir. 2009). We consider "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." Id. (quoting Bass v. Flying J, Inc., 500 F.3d 736, 739 (8th Cir. 2007)). "[A] new trial is necessary only when the errors misled the jury or had a probable effect on a jury's

verdict." Slidell, Inc. v. Millennium Inorganic Chems., Inc., 460 F.3d 1047, 1054 (8th Cir. 2006).

Read as a whole, the district court's instructions fairly and adequately submitted the issues to the jury. The evidence allowed Cargill to take the position that its contract with Greater Omaha comprised the June 2, 2006, guarantee and other documents. The district court thus did not abuse its discretion in allowing the jury to decide whether those documents or the guarantee alone made up the contract. In any event, Greater Omaha has not shown that it suffered any prejudice from the instructions as given. The central issue in this litigation has always been whether Greater Omaha sold and shipped contaminated raw material to Cargill, not whether its doing so constituted a breach. Moreover, the instruction that charged the breach-of-contract count identified only the June 2, 2006, guarantee as the contract and explained that Cargill was required to prove that Greater Omaha breached the contract by supplying raw beef trim adulterated with *E. coli* O157:H7. Greater Omaha has not articulated how it would have proceeded differently at trial or how the instruction might have misled the jury or affected the verdict.

We also find no abuse of discretion in the district court's decision to forego instructing the jury on exclusion or modification of implied warranties. The Nebraska Supreme Court has followed the rule that "disclaimers or warranty made on or after delivery of the goods by means of an invoice, receipt, or similar note are ineffectual unless the buyer assents or is charged with knowledge as to the transaction." Pfizer Genetics, Inc. v. Williams Mgmt. Co., 281 N.W.2d 536, 539 (Neb. 1979). The invoices Greater Omaha sent to its customers the day after it shipped goods included a disclaimer of warranties. Cargill had no record of receiving the relevant invoices, for it did not remit payment pursuant to invoices. It instead used a payment method that involved weighing shipments and electronically transferring funds from its bank account to its suppliers' bank account. Given the state of the record, the district court could determine that because the evidence did not permit a finding that Greater Omaha had effectively

disclaimed warranties in its invoices to Cargill, it was not entitled to an instruction to that effect.

## D. Verdict

Greater Omaha argues that the district court should have granted a new trial because the jury reached an impermissible compromise verdict. As set forth above, Cargill requested damages in the amount of $25,270,768.50 in settlement costs and $548,604.51 in business costs. Greater Omaha contends that the only logical explanation for the jury's $9 million award is that the jury disregarded the district court's instructions, decided that Greater Omaha was only partly liable, and awarded damages commensurate with Greater Omaha's liability.

Greater Omaha has not shown that the jury reached a compromise verdict. "A compromise verdict results when the jury, unable to agree on the issue of liability, compromises that disagreement by awarding a party inadequate damages." Boesing v. Spiess, 540 F.3d 886, 889 (8th Cir. 2008). The district court properly instructed the jury that it was required to return a verdict for Greater Omaha if it found that Cargill had in part caused the damages or if it found that Cargill had misused Greater Omaha's product. The jury asked no substantive questions after the case was submitted to it and returned its verdict after deliberating only for a few hours. Moreover, Greater Omaha had disputed the amount of damages, arguing that they were unreasonable and motivated by a desire to protect Cargill's corporate image. The jury may have agreed with Greater Omaha and reduced the award accordingly. The record simply does not indicate that the jury reached a compromise verdict because it was unable to agree on Greater Omaha's liability, and thus the district court did not abuse its discretion in denying Greater Omaha's motion for a new trial on that ground. See id. (standard of review).

-16-

E. Counterclaim

In 2009, the <u>New York Times</u> published the article, "The Burger That Shattered Her Life," about a Minnesota woman who became sick after eating an undercooked Cargill patty tainted with *E. coli* O157:H7. The article traced the history of her burger. It explained that the Cargill patties were made with raw materials from four suppliers, including Greater Omaha. The following passage appeared near the end of the article:

> Shawn K. Stevens, a lawyer in Milwaukee working for Cargill, began investigating. Sifting through state health department records from around the nation, Mr. Stevens found the case of a young girl in Hawaii stricken with the same E. coli found in the Cargill patties. But instead of a Cargill burger, she had eaten raw minced beef at a Japanese restaurant that Mr. Stevens said he traced through a distributor to Greater Omaha.
>
> "Potentially, it could let Cargill shift all the responsibility," Mr. Stevens said. In March, he sent his findings to William Marler, a lawyer in Seattle who specializes in food-borne disease cases and is handling the claims against Cargill.
>
> "Most of the time, in these outbreaks, it's not unusual when I point the finger at somebody, they try to point the finger at somebody else," Mr. Marler said. But he said Mr. Stevens's finding "doesn't rise to the level of proof that I need" to sue Greater Omaha.

Michael Moss, <u>The Burger That Shattered Her Life</u>, N.Y. Times, Oct. 4, 2009, at A25.

Greater Omaha's counterclaim for tortious interference was based on information Stevens gave to the reporter. Greater Omaha alleged that "Cargill's implication of [Greater Omaha] in the alleged *E. coli* O:157:H7 outbreak that occurred as a result of Cargill's production of hamburger in August 2007 was intentional, wrongful, false and misleading." The district court determined that Greater Omaha had shown no

interference by Cargill, however, and granted Cargill's motion for summary judgment. See Recio v. Evers, 771 N.W.2d 121, 131 (Neb. 2009) (setting forth the elements of a tortious interference claim).

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. Crews v. Monarch Fire Prot. Dist., 771 F.3d 1085, 1089 (8th Cir. 2014). We will affirm if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

We have said that to survive a motion for summary judgment, "the requisite 'genuine dispute,' Fed. R. Civ. P. 56(a), must appear in *admissible* evidence." Id. at 1092 (emphasis in original). "[N]ewspaper articles are 'rank hearsay' that do not fit a hearsay exception." Id. (quoting Nooner v. Norris, 594 F.3d 592, 603 (8th Cir. 2010)). Although alleged tortious statements "may not themselves be hearsay, see Fed. R. Evid. 801(c)(2), (d)(2)(A), the second level—[the] newspaper's out-of-court assertion that [the declarant] in fact made these statements—is hearsay." Id. The district court concluded that statements attributed to Stevens in the New York Times article and in emails from the reporter to Cargill were inadmissible hearsay that could not be used to support Greater Omaha's counterclaim.

Greater Omaha argues that it should not have been required to produce admissible evidence to oppose Cargill's motion for summary judgment. According to Greater Omaha, it is not whether the nonmoving party supports its claim with evidence that is admissible, but whether it supports its claim with evidence that could be admissible. See Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment (explaining that after a party objects that material cannot be presented in an admissible form, "[t]he burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated"). The district court determined that Greater Omaha had failed to show how the article and emails might be reduced to an

-18-

admissible form at trial. Although Greater Omaha had mentioned that it might call the reporter as a witness, the <u>New York Times</u> had not responded to a subpoena and Greater Omaha had neither deposed the reporter nor obtained an affidavit as to what the reporter might testify to at trial, leading the district court to rule that "[t]here was no evidence in the summary judgment phase as to what [the reporter] might offer, if anything, in court." D. Ct. Order of Apr. 14, 2014, at 9. We conclude that the district court did not apply the wrong standard of proof or otherwise err in granting Cargill's motion for summary judgment.

## III. Conclusion

The judgment is affirmed.

_____